# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**5308 FAB Ltd,**
**formerly known as WAY FABRICATORS LTD,**
**and WAY ENGINEERING Ltd,**

        **Plaintiff-Counterclaim Defendant,**

**and**                                      **Case No. 10-C-183**

 **WELLS FARGO BANK NA,**

        **Involuntary Plaintiff,**

**v.**

**TEAM INDUSTRIES INC.,**

        **Defendant-Counterclaimant.**

---

# DECISION AND ORDER

---

This lawsuit arises from warranties made in conjunction with the January 2008 sale of a pipe fabrication facility and assets in Port Arthur, Texas ("Port Arthur facility"). Relying upon the diversity jurisdiction afforded by 28 U.S.C. § 1332, the seller of the Port Arthur facility, Plaintiff-Counterclaim Defendant 5308 FAB Ltd.,[1] ("FAB"), formerly known

---

[1] When FAB, a limited partnership, is reduced through its levels of general and limited partners, it is comprised of two individuals who are citzens of Texas. (Compl. ¶ 2.) Way Engineering and Way Fabricators are also limited partnerships that are comprised of two individuals who are citizens of Texas. (*Id*. at ¶¶ 2-3.)

as Way Fabricators Ltd ("Way Fabricators") and Way Engineering Ltd, ("Way Engineering") (collectively "Way"), and the Involuntary Plaintiff, Wells Fargo Bank NA ("Wells Fargo" or the "escrow agent"), commenced this action against the buyer, Defendant-Counterclaimant, TEAM Industries Inc. ("TEAM").[2] Way seeks declaratory judgment finding that it did not breach any contractual representations or warranties (Count 1) and an order directing Wells Fargo to release to Way the escrowed funds (Count 2).

Also relying upon diversity jurisdiction, TEAM filed a counterclaim for declaratory judgment finding that WAY breached its contractual representations and warranties regarding the condition of the property and assets, and, therefore, TEAM is entitled to the escrowed funds (Count I). As an additional counterclaim, TEAM alleges that Way breached its contract and that, as a result of that breach, TEAM incurred damages in excess of the escrowed funds and, therefore, should be awarded additional damages (Count II).

This Decision and Order addresses Way's motions to exclude the expert testimony, report, and affidavit of TEAM's expert Jason Sturn ("Sturn") and for summary judgment on its Complaint and against TEAM on its counterclaims, and TEAM's motion for partial summary judgment on its counterclaims. Since TEAM relies on Sturn's opinions with respect to the summary judgment motions and expert testimony must be admissible to be considered upon summary judgment, *see Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009), the Court begins with Way's motion to exclude.

---

[2]TEAM is a Wisconsin corporation with its principal place of business in Kaukauna, Wisconsin. (Compl. ¶ 5; Ans. ¶ 5.)

# MOTION TO EXCLUDE

By its motion to exclude, Way seeks the exclusion of all proffered expert opinions of Sturn, including his expert report and his affidavit dated June 17, 2011. Way contends that Sturn's opinions are not supported by proper methodology, and Sturn is not qualified to give an opinion on the cause of any failures in the electrical system as required by Rule 702 of the Federal Rules of Evidence.

TEAM opposes the motion, contending that Sturn has practical knowledge in an industrial production environment and will testify to the primary facts involving his experience and his observations associated with the old shop in the Port Arthur facility, coupled with the language of the indemnification provision to show that certain losses or demands resulted from the breach of warranty. TEAM contends that Sturn's observations support its claim for losses it has sustained as a result of Way's breach of warranty.

In reply, Way maintains that, while TEAM claims that Sturn's experience and "observations" make his opinions reliable, reliable expert opinions may not be based on the expert's "expertise" alone, without any analytic strategies or scientific analysis. Additionally, Way contends that Sturn's supposed "observations" are not observations; they are recitations of the observations that others reported to him. Way also asserts that TEAM offers no facts to establish that Sturn is qualified to opine on electrical systems, and that experience as a maintenance manager does not make him an electrical expert.

## Background

Sturn has been the Maintenance Manager at TEAM for over 15 years, he regularly makes recommendations to TEAM's board of directors to repair or replace equipment and systems. (Sturn Aff. (ECF No. 32) ¶ 2.) Sturn's day-to-day responsibilities are in Wisconsin. (*Id*. at ¶ 10.) Edward L. Peveto, Jr. ("Peveto") and Chas Theriot ("Theriot"), respectively, are the on-site facility manager and maintenance manager for the Port Arthur facility. (Kastens Decl. filed May 20, 2011 (Kastens Decl. I) (ECF No. 24, Attach. 1), Ex. E (Theriot Dep.) 17, 59.)

Sturn has a vocational degree from a technical college in fluid power, as well as an associate degree in police science. (Sturn Aff., Ex. 2 at 6.) Between 2001 and 2002, Sturn took three courses from a technical college that relate to electricity: "2001 Electrical Machines & Controls"; "2001 Electrical Power Systems"; and "2000 Electricity for Electronics." He also took a vocational course in 2002 entitled the "Elements of Machines." Sturn does not have a degree in any electrical-related field. (*Id.*)

In his affidavit, Sturn offers the following opinions regarding causation: "(c) The electrical system as well as the equipment at the facility was in poor condition because of Way's neglect"; "(d) If Way had followed appropriate and normal maintenance procedures, TEAM would not be experiencing the problems that have arisen"; and "(f) The costs identified in the [contractor quotations for replacing the electrical system] were due to the breach by Way of Paragraph 5.1(b) in the Asset Purchase Agreement, and Paragraph 5(c)

4

of the Real Estate Purchase Agreement." (Sturn Aff. ¶ 11(c)-(f).) In so doing, Sturn purports to opine as to causation of the failures of both the equipment and the electrical system.

## Applicable Law

Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Such determinations are also governed by Rule 104(a) of the Federal Rules of Evidence:

> "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) [pertaining to conditional admissions]. In making its determination it is not bound by the rules of evidence except those with respect to privileges."[3] These

---

[3] *Daubert* cites the version of Rule 104(a) as amended in 1987. Pursuant to the December 1, 2011, amendments to the Federal Rules of Evidence, Rule 104 has been reworded; however, the amendments are intended to be stylistic only and there is no intent to change any result in any ruling on evidence admissibility. *See* Advisory

> matters should be established by a preponderance of proof. *See Bourjaily v. United States*, 483 U.S. 171, 175-176 (1987).

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993).

In addition, Rule 704(a) of the Federal Rules of Evidence states that "[a]n opinion is not objectionable just because it embraces an ultimate issue." *See Roundy's Inc. v. N.L.R.B.*, Nos. 10-3921 & 11-1292, __ F.3d ___ , 2012 WL 752541, at *6-*7 (7th Cir. Mar. 9, 2012), "The committee notes to that Rule explain however that Rule 702, which requires that opinion be helpful to the trier of fact, and Rule 403, which provides for exclusion of evidence that wastes time, 'afford . . . assurance[ ] against the admission of opinions which would merely tell the [trier of fact] what result to reach. . . .' Fed. R. Evid. 704, 1972 advisory committee notes." *Id*. In addition, "Rules 702 and 704 'prohibit experts from offering opinions about legal issues that will determine the outcome of a case.'" *Id*.

As recently reiterated "[i]t is the district court's role to ensure that expert testimony is both relevant and reliable." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011)(citing *Daubert*, 509 U.S. at 589). To do so, this Court must ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id*. at 893-94 (quoting Fed. R. Evid. 702 and citing *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (outlining "three-step analysis" to be used by district courts before admitting expert testimony)). *Daubert* sets forth the following non-exhaustive factors

---

Committee Notes to 2011 Amendments to Rule 104.

for the district court to consider when assessing an expert's methodology: (1) whether the theory has been or is capable of being tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error; and (4) the theory's level of acceptance within the relevant community. *Id.* at 894 (citing *Daubert*, 509 U.S. at 593-94.)

"Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (citing *Daubert*, 509 U.S. at 596). "Expert testimony is liberally admissible under the Federal Rules of Evidence." *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 723 (E.D. Wis. 2008). Thus, there is a presumption of admissibility for expert testimony so long as it is relevant, reliable, will assist the trier of fact, and is not unduly prejudicial.

## Qualifications as an Expert

An expert witness may be qualified as an expert by knowledge, skill, experience, training, or education. Fed. R. Evid. 702. *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000), explains that

> [t]he notion that *Daubert* requires particular credentials for an expert witness is radically unsound. The Federal Rules of Evidence, which *Daubert* interprets rather than overrides, do not require that expert witnesses be academics or PhDs, or that their testimony be 'scientific' (natural scientific or social scientific) in character. Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness.

(citations omitted).

The cases cited by TEAM in support of its contention that Sturn is an expert are of limited value. *Slip Track Systems, Inc. v. Metal-Lite, Inc.*, 304 F.3d 1256, 1266-67 (Fed. Cir. 2002), is a patent decision where the court found that an individual's six years of experience in the construction industry qualified that individual to testify as an expert about the stability of particular wall constructions, absent any evidence to support the competitor's claim that a formal engineering degree was required for "one of ordinary skill in the art" – a specialized term in the patent field. *See e.g.* Mark T. Banner, Christopher J. Renk and Ted L. Field*, Practising Law Institute-Patent Litigation* § 8:3.2 & n.7 (20 October 2011) *available at* Westlaw PLIREF-PATLIT. *Slip Track* does not mention a *Daubert* challenge or undertake a *Daubert* analysis.

*Spearman Industries, Inc. v. St. Paul Fire and Marine Insurance Co.*, 138 F.Supp.2d 1088, 1096 (N.D. Ill. 2001),[4] which TEAM also cites, is somewhat more helpful. In that action, the district court allowed the proffered expert testimony of a roofer, with lifelong involvement in the roofing industry in variety of capacities, that a winter storm was the sole source of damage to a roof. Rejecting the defendant insurer's argument that the roofer's opinion was outside the scope of his expertise because it incorporated engineering and aerodynamics principles, the district court held that the expert's general expertise in the broad

---

[4]"A district court decision does not have precedential effect, *Midlock v. Apple Vacations West, Inc.*, 406 F.3d 453, 457-58 (7th Cir. 2005); *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1124 (7th Cir. 1987) – that is, it is not an authority, having force independent of its reasoning." *Wirtz v. City of South Bend*, No. 11-3811, 669 F.3d 860, 2012 WL 384861, at *3 (7th Cir. Feb. 7, 2012).

subject of roofing was enough to qualify him as an expert. *Id.* (citing *Quinton v. Farmland Indus.*, 928 F.2d 335, 336 (10th Cir. 1991) (finding that a veterinarian need not be a toxicologist to testify on the toxic effect of a substance on cows); *Baumholser v. Amax Coal Co.*, 630 F.2d 550, 551 (7th Cir. 1980) (finding that the trial court did not abuse its discretion in permitting a geologist to testify that a blast from coal mine operations was the proximate cause of damage to the plaintiff's home even though the geologist based his opinion on general geological principles and had little actual experience with coal mining)).  Thus, the court concluded that roofer's lack of specialization in the specific aspect of what causes roof damage goes to the weight of his testimony, but it did not necessarily entail engineering and aerodynamic principals beyond his expertise. *Id.*  (citing *United States v. Alzanki*, 54 F.3d 994, 1006 (1st Cir. 1995) ("[w]hile the more generalized nature of the proffered testimony may temper its probative value to the factfinder, we do not think it can be said that its relevance is negated entirely.")).

   In comparison to the information provided about the roofer in *Spearman,* the information provided by TEAM is not very detailed with respect to his expertise with respect to electrical matters.   However, as maintenance manager who oversees ten individuals at TEAM's Wisconsin facility, Sturn is qualified by training and experience to perform that job.  His recommendations  are relied upon by TEAM's board of directors.  Sturn also took three electrical-related classes.  In contending that Sturn is not an electrical expert, Way notes that, after determining the electrical distribution system might require replacement, Sturn

"recommended and TEAM began consulting with companies in the field of electrical distribution system evaluation." (Sturn Aff. ¶ 8.) However, Sturn's report indicates that over the last three years a circuit breaker was changed at the Kaukauna, Wisconsin plant, (*Id.* at ¶ 10) and Sturn prepared the request for quotation to replace the electrical system in the old shop at the Port Arthur facility, which was limited to the work necessary to remedy the problems identified in TEAM's warranty claims in this lawsuit. The information that TEAM has provided is adequate to establish that Sturn is qualified by his practical experience and educational background as an electrical expert qualified to give opinions regarding the electrical distribution system problems. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). Perhaps, TEAM could have provided a more robust description of what Sturn's job as maintenance manager entails. However, Sturn's report can be deemed to establish his practical expertise in electrical matters. Any lack of expertise could be brought out in cross-examination.

The issue is much clearer with respect to the equipment maintenance. Sturn has 15 years of experience maintaining TEAM's machines, and he evaluated the condition of the welding machines, cutting machine, the positioners and jib hoists. (*Id.* at ¶ 6.) After doing so and considering the effectiveness and cost efficiencies of replacement and repair alternatives, Sturn decided that the equipment should be replaced. (*Id.*) Factors that Sturn considered were the age of machines, the condition of those machines (including the potential safety hazards presented by their condition), the down-time history of the machines, and the efficiency gains

10

of the machines.  Sturn avers that the condition and the down-time history were significant factors in the decision process and the two factors were "directly influenced by the prior lack of maintenance of the machines."  (*Id.*)  Sturn is qualified by experience as an expert in maintaining the type of machines used in the pipe fabrication industry.

### Reliance on Information from Other Sources

Way also maintains that Sturn's "observations" are not his observations; they are recitations of what others observed and reported to him.  However, "unlike lay witnesses, who must testify based on first-hand knowledge, expert witnesses do not need to have first hand knowledge of the underlying facts; they may testify to facts perceived by or made known to the expert at or before the hearing."  *See Daubert*, 509 U.S. at 592 ("Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."); *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 789 (7th Cir. 2000) (holding that expert witness was not required to have direct evidence or a personal observation that the defendant was illegally dumping hazardous compounds.) Thus, Way's contention that an expert's opinions may not be predicated upon the observations of others is not legally persuasive.

### Reliability of Opinion

Rule 702 also requires that the expert explain the "methodologies and principles" that support his opinion; he cannot simply assert a "bottom line."  *Metavante Corp.*, 619 F.3d at 761 (quoting *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010) and citing *United States*

*v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) (rejecting expert testimony where expert "in essence, told the jury nothing more than, 'I am familiar with the definition of child pornography, and this meets that definition because I said so' ")).  Nor may the testimony be based on subjective belief or speculation.  *Id.*

Regardless of Sturn's expertise regarding electrical matters and in maintaining the type of machines used in the pipe fabrication industry, TEAM has not established that Sturn's opinions regarding the failures of the electrical distribution system and equipment are the product of reliable principles and methods, and that he has reliably applied the principles and methods to the facts of the case.  TEAM does not argue why Sturn's report is the product of reliable principles and methods; it seems to ask the Court to accept, as a matter of faith, Sturn's report and conclusions as reliable.

Sturn's report implies a finding that Way did not follow appropriate and normal maintenance procedures for equipment.  However, he does not define the source of the appropriate and normal maintenance procedures or indicate that an industry standard exists. Sturn merely states that "it is a simple fact that well maintained equipment performs better and remains in service longer than neglected equipment."[5]  (Sturn Aff., Ex. 2 (Sturn Report) 4.) No empirical information is provided to support Sturn's statement that well-maintained equipment performs better and remains in service longer than neglected equipment or that the failure for Way to maintain the Port Arthur facility equipment was the cause of the equipment

---

[5]In addition, if 'it is a simple fact that well maintained equipment performs better and remains in service longer than neglected equipment," a jury does not need expert help in understanding that.

problems claimed by TEAM. While the Court is aware that poorly supported expert opinions may be exposed by cross-examination, no underlying methodology or principles are provided for Sturn's opinions.

Beyond that, TEAM has not established that (1) the theory has been or is capable of being tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error; and (4) the theory's level of acceptance within the relevant community. The Court recognizes that an expert in machine maintenance may not have his theories subjected to peer review and publication; however, at the most basic level, there is no support provided for Sturn's assertion that "well maintained equipment performs better and remains in service longer than neglected equipment" or that Way's failure to maintain the equipment was the cause of TEAM's claimed equipment problems. *See Chapman v. Maytag Corp.*, 297 F.3d 682, 685 (7th Cir. 2002) (holding that the district court failed to properly assess scientific validity of a mechanical engineer's theory that the decedent would have been electrocuted regardless of whether range would have been properly grounded).

His opinions with respect to the electrical distribution system have similar flaws. Again, Sturn has not provided any empirical information to back the proposition that the electrical distribution systems would have lasted longer and performed better if Way had followed appropriate and normal maintenance procedures and TEAM would not be experiencing the problems that have arisen. TEAM has not established that Sturn's opinions

are the product of reliable principles and methods; and that he reliably applied the principles and methods to the facts of this case.

Based on the foregoing, at this juncture, Way's motion to exclude is granted under Rule 702 because TEAM has not established that Sturn's opinions regarding the machine maintenance and the electrical distribution systems are the product of reliable principles and methods and that he reliably applied the principles and methods to the facts of this case. The Court's opinion may be revisited if TEAM provides additional information.

In addition, the ruling does not extend to all testimony by Sturn. He may provide testimony as to the primary facts involving his experience, and his observations associated with the Port Arthur facility.

## MOTIONS FOR SUMMARY JUDGMENT

The Court now addresses Way's motion for summary judgment in its favor on the Complaint and against TEAM on its counterclaims, and TEAM's motion for partial summary judgment on its counterclaims. In support of their respective summary judgment motions, the parties filed proposed findings of fact, and statements of additional facts.

An initial question in resolving the motions is to determine whether there is a genuine dispute of material fact precluding resolution of this action upon summary judgment. In making that determination, the Court applies the following criteria to the proposed findings of fact ("PFOF") and additional statements filed by the parties. The Court also notes that to

the extent that any proposed findings of fact or statements of additional facts were phrased in an argumentative or slanted manner, they have been revised to eliminate such phrasing.

## Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "a party may move for summary judgment, identifying each claim . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). This Court must view the facts in the light most favorable to the non-movant, resolving all evidentiary conflicts in its favor and according it the benefit of all reasonable inferences that may be drawn from the record. *See O'Leary v. Accretive Health*, *Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Put another way, summary judgment is appropriate when there are no genuine factual issues that could lead a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250-51 (1986).

Although the moving party bears the initial burden of informing the Court of the basis for its motion, it may satisfy its burden by simply showing or pointing out to the Court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477

U.S. at 325.  The mere existence of a scintilla of evidence in support of the plaintiff's position

will be insufficient to withstand summary judgment.  *See Anderson*, 477 U.S. at 252.

**Relevant Facts**[6]

*The Parties*

FAB is a limited partnership that was formerly known as Way Fabricators.

Until January 2008, Way Fabricators was engaged in the custom fabrication of metal piping,

primarily for the petrochemical and refining industries, and conducted pipe fabrication

operations at the Port Arthur facility.[7]

TEAM is a Wisconsin corporation with its principal place of business located

at 1200 Maloney Road, in Kaukauna, Wisconsin.  TEAM's website states that it is "North

America's leader for on-time delivery of high quality pipe fabrication and fabricated vessels."

*Port Arthur Facility*

Pipe fabrication work including pipe-welding is carried out at the Port Arthur

facility.  One area of the facility, referred as to the old shop, was built in the 1970's.  The other

area of the facility, referred to as the new shop, was built in about 1999.  Two different types

of electrical distribution systems service, with separate transformers, service each shop.  A

---

[6]The relevant facts are based on the parties' proposed findings of fact and statements of additional facts, to the extent they are undisputed.  However, the citations to the underlying factual material are provided for all quoted statements, even those that are undisputed.

[7]There is a factual dispute between the parties regarding whether the Port Arthur facility contains one building or two buildings where pipe fabrication work is carried out.  (*See* Def.'s Resp. Pls.' PFOF ¶ 5.)  However, the dispute is not material because it is used to identify the two areas.  For the sole purposes of this opinion, the Court refers to the old shop and the new shop irrespective of whether they are housed in separate buildings.

"delta" system[8] services the old shop; a "wye" system[9] services the new shop. The transformers servicing the Port Arthur facility are owned, controlled, and maintained by Entergy Texas, Inc. ("Entergy"). Way did not own the transformers and TEAM does not own them.

*TEAM's Interest in the Facility and Due Diligence*

In 2007, TEAM approached Way regarding TEAM's interest in purchasing Way's facilities. On about August 30, 2007, the parties signed a letter of intent. A letter dated October 15, 2007, written by John Panetti ("Panetti"), Chairman and CEO of TEAM, to Way, states that TEAM preferred "purchasing the assets versus a stock purchase" because by an asset purchase TEAM could "greatly reduce the due diligence necessary and thereby consummate the transaction much more expeditiously." (*Id.*, Ex. V, WAY00067.) The letter

---

[8]A delta ( ) system is:

[a] configuration of a three-phase primary or secondary electrical system that does not employ a conventional neutral conductor. In transformers and loads, it takes the form graphically of an equilateral triangle. A delta wiring system will have three phase conductors and no neutral conductor. The advantage of a delta system is balanced loading, but the disadvantage is, if no phase wire junction is grounded for safety, an unintended grounding of a phase wire will be hard to detect and a second phase wire faulting to ground will create a very dangerous condition. Primary delta systems are more susceptible to damage from lightning strikes and system over-voltage conditions.

psc.wi.gov/utilityInfo/electric/documents/strayVoltage/glossary.pdf (last visited Mar. 27, 2012.)

[9]A wye (Y) Configuration is defined as follows:

A term used to describe a three-phase electrical system with or without a neutral conductor. When a neutral conductor is present, it will carry any imbalance current from the three phase wires. The value of the imbalance current is calculated using vector mathematics for the currents. For example, a system having a phase A current of 12 Amps, a phase B current of 10 Amps and a phase C current of 18 Amps will have a neutral current of just over 7.2 Amps. The phase angle will be minus 106 degrees (slightly out-of-phase with phase C).

psc.wi.gov/utilityInfo/electric/documents/strayVoltage/glossary.pdf (last visited Mar. 27, 2012).

states "[f]ollowing is a list of items which would need to be looked at during a due diligence process. This list is not exhaustive as there will be some additional items to be looked at as we go through the process." The list includes "Facilities and Equipment," "Real Estate Issues," and "Operational Questions." (*Id.*, Ex. V, WAY00067.)

During its due diligence inspection, representatives of TEAM visited the Port Arthur facility twice. Representatives of TEAM walked the grounds with Peveto, a certified welder and journeyman pipefitter, who began working at Port Arthur facility in 1979.[10] At that time, TEAM did not ask Peveto any questions regarding the electrical system. TEAM relied on the representations and warranties from Way in the purchase and sale agreements. TEAM asked questions relating to the capacity of the Port Arthur facility and the number of work stations that were operating at the facility.

*The Contract Documents*

TEAM ultimately decided to purchase the Way facilities through an asset purchase, rather than a stock purchase. To accomplish this objective, TEAM and Way executed two separate contracts related to the assets (an Asset Purchase Agreement and a Real Estate Purchase Agreement) and a third agreement whereby part of the purchase price would be held in escrow until the end of the agreements' warranty period.

---

[10]Peveto has a long and continuing relationship with the Port Arthur facility. Peveto was the Port Arthur facility manager before it was owned by Way Fabricators. He continued in that capacity during the entirety of Way Fabricators' ownership of the facility and into the present with TEAM's ongoing ownership of the facility.

On January 22, 2008, Way Fabricators, Way Engineering, and TEAM executed an Asset Purchase Agreement. That day, Way Fabricators and TEAM executed an Agreement for Purchase and Sale of Real Property, which was amended on January 31, 2008. Huey Todd Corry ("Corry"), who was the President of Way Fabricators and Way Engineering until March 31, 2011, signed the agreements on behalf of Way.

Corry knew that beginning sometime in 2005, Peveto had total responsibility for the facility. (Nash Aff. filed May 20, 2011 (ECF No. 28) ("Nash Aff. I") Corry Dep. 12-13.)[11] No one talked to Peveto about the representations and warranties made in the agreements. Way represented and warranted that the assets were maintained in accordance with sound maintenance practices because the "equipment was operating." (Nash Aff. I, Corry Dep. 24.) According to Corry, Way was informing TEAM of everything that Way knew about the Port Arthur facility.

*Real Estate Purchase Agreement*

TEAM purchased the Port Arthur facilities through a Real Estate Purchase Agreement, entitled "Agreement for Purchase and Sale of Real Property." (*See* Kastens Decl. I ¶ 4, Ex. B (Agreement for Purchase and Sale of Real Property) ¶ 1.) Among other things, through the Real Estate Purchase Agreement, TEAM purchased the Port Arthur real estate and "[a]ll buildings, improvements and fixtures situated on the Land." (*Id.*, Ex. B ¶ 1(b).)

---

[11]The statement is based on paragraph 35 of TEAM's additional proposed findings of fact. Way objected to the proposed finding on the grounds that the record does not support that characterization and is not material. Such objections are inconsistent with the cited evidence and without merit.

In the Real Estate Purchase Agreement, Way made the following warranties:

(c) To the best of Seller's knowledge, information and belief, all utilities required for the normal operation of the Property as it is being currently operated . . . are adequate to serve the Property and to permit full compliance with all requirements of law.

(d) Seller knows of no facts which would prevent the use and operation of the Property after Closing in the manner in which it is currently being operated and used.

(*Id.*, Ex. B, 4-5, ¶¶ 5(c) & (d).)

In paragraph 5(h) of the Agreement for Purchase and Sale of Real Property, Way Fabricators represents and warrants to TEAM, in part, as follows: "Any and all covenants, warranties and representations made by [Way Fabricators] in the Asset Purchase Agreement relating to the Property are incorporated herein by reference with the same force and effect as if fully set forth herein." (Compl., Ex. B (Agreement for Purchase and Sale of Real Property) ¶ 5(h).)

The Agreement for Purchase and Sale of Real Property also states:

AS-IS WHERE IS. ***EXCEPT FOR REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT OR THE ASSET PURCHASE AGREEMENT***, IT IS UNDERSTOOD AND AGREED THAT [WAY FABRICATORS] IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, INCLUDING BUT NOT LIMITED TO, WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, . . . PHYSICAL OR ENVIRONMENTAL CONDITION[,] UTILITIES , . . . THE COMPLIANCE OF THE PROPERTY WITH

20

GOVERNMENTAL LAWS, . . . OR ANY OTHER MATTER OR THING REGARDING THE PROPERTY. BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO BUYER AND BUYER SHALL ACCEPT THE PROPERTY "AS IS, WHERE IS, WITH ALL FAULTS.

(*Id.* Ex. B ¶ 20.)  (Emphasis added.)

The provision continues:

BUYER WILL CONDUCT PRIOR TO CLOSING SUCH INVESTIGATIONS OF THE PROPERTY, INCLUDING BUT NOT LIMITED TO THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS BUYER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE PROPERTY AND THE EXISTENCE OR NONEXISTENCE OF CURATIVE ACTION TO BE TAKEN WITH RESPECT TO ANY HAZARDOUS OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE PROPERTY, AND WILL RELY SOLELY UPON THE SAME AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF THE SELLER OR ITS AGENTS OR EMPLOYEES WITH RESPECT THERETO *OTHER THAN FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN IN THIS AGREEMENT OR THE ASSET PURCHASE AGREEMENT*,.[sic] UPON CLOSING, BUYER SHALL ACCEPT THE RISK THAT ADVERSE MATTERS, INCLUDING BUT NOT LIMITED TO, CONSTRUCTION DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY BUYER'S INVESTIGATIONS, *AND EXCEPT FOR ANY CLAIM THAT SELLER MAY HAVE FOR A BREACH OF A REPRESENTATION OR WARRANTY AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR THE ASSET PURCHASE AGREEMENT*, BUYER UPON CLOSING, SHALL BE DEEMED TO HAVE WAIVED, RELINQUISHED AND RELEASED SELLER FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT),

> LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS' FEES AND COST COSTS) OF ANY KIND AND CHARACTER, KNOWN AND UNKNOWN, WHICH BUYER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER AT ANY TIME BY REASON OF OR ARISING OUT OF ANY CONSTRUCTION DEFECTS, PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS (INCLUDING ANY ENVIRONMENTAL LAWS) AND ANY AND ALL OTHER ACTS, OMISSIONS, EVENTS, CIRCUMSTANCES OR MATTERS REGARDING THE PROPERTY.

(*Id.* Ex. B ¶ 20, 13.) (Emphasis added.)

In the same paragraph, the parties emphasized the scope and purpose of the warranty disclaimer and waiver:

> BUYER ACKNOWLEDGES THAT THE PURPOSE OF THIS PARAGRAPH IS FOR BUYER, TO THE FULLEST EXTENT POSSIBLE AT LAW, TO WAIVE, RELINQUISH, RELEASE AND DISCLAIM, ANY CLAIM OR LIABILITY OF OR AGAINST SELLER AS THE RESULT OF ANY CONDITION OR STATE OF FACTS RELATING OR PERTAINING TO THE PROPERTY ON THE CLOSING DATE *EXCEPT FOR REMEDIES AFFORDED TO BUYER AS A RESULT OF A BREACH OF A SELLER'S REPRESENTATION OR WARRANTY CONTAINED HEREIN OR IN THE ASSET PURCHASE AGREEMENT.*

(*Id.* Ex. B ¶ 20, 13.) (Emphasis added.)

*Asset Purchase Agreement*

The Asset Purchase Agreement specifically notes that the "Assets" purchased by TEAM included "[a]ll tangible assets of every kind and description owned or used in the operation of the Business, including all fixed assets, machinery, equipment, tools, leasehold

improvements, tools, accessories, fixtures, furniture, furnishings, vehicles, computers and

software, date processing equipment, supplies, and other items of similar character relating to

the Business, wherever located . . . ." (Compl. Ex. A (Asset Purchase Agreement) § 1.1(a).)

The Asset Purchase Agreement's definition of the "Assets" purchased by TEAM also

explicitly incorporates "[t]he real property at 650 Main Avenue, Port Arthur Texas ("Real

Estate") pursuant to the terms of the Real Estate Purchase Agreement between Buyer [TEAM],

Seller [Way Fabricators] and Partner [Way Engineering] . . . ." (*Id.* Ex. A ¶ 1.1(n).)

      In the Asset Purchase Agreement, Way Fabricators and Way Engineering

provided TEAM with joint and several warranties and representations to survive for a period

of 18 months after closing of the transaction. Those warranties and representations provided,

in part, that: "The Assets are: (i) in good operating condition and repair, ordinary wear and

tear excepted; (ii) maintained in accordance with sound maintenance practices; (iii) are

sufficient for the operation of the Business in the ordinary course of business; and (iv) are

suitable for the purpose for which they are presently used." (*Id.*, Ex. A ¶ 5.1(b).) The phrase

"maintained in accordance with sound maintenance practices" is not defined in any of the

agreements at issue. The Asset Purchase Agreement provided that the warranties identified

above would survive the closing date for a period of 18 months. (*Id.*, Ex. A ¶ 5.2.) Paragraph

5.2 also provided that warranty claims not timely made were waived:

> If a claim for indemnification based on the breach of a warranty
> or representation of Seller and Partner is made in writing prior to
> the expiration of the above survival periods, such warranty and
> representation and the rights of indemnity with respect thereto

shall survive such expiration until the claim is resolved or final judicial determination of the claim. ***Any such indemnification claim not so made in writing prior to the expiration of such applicable survival period shall be deemed to have been waived.***

(*Id.*) (Emphasis added).

Section 11.1 of the Asset Purchase Agreement states as follows:

11.1 Indemnification of Buyer. Subject to Sections 11.5 and 11.6, Seller and Partner jointly and severally agree to indemnify Buyer and its directors, officers, shareholders, employees and agents and to hold them harmless from and against any and all damages, losses, deficiencies, actions, demands, judgments, costs and expenses (including attorneys' and accountants' fees) (collectively "Losses") resulting from (i) any misrepresentations or breach of warranty hereunder on the part of Seller or Partner; (ii) any nonfulfillment of any agreement or covenant contained herein or in any certificate, document, agreement or instrument delivered hereunder on the part of Seller or Partner; or (iii) any failure of Seller or Partner to pay or satisfy any Excluded Liabilities.

(*Id.*, Ex. A ¶ 11.1.)   The Asset Purchase Agreement contemplated that $500,000.00 of the purchase price to be paid by TEAM would be deposited in escrow - with those funds being held and disbursed in accordance with agreed-upon terms for same.

*Escrow Agreement*

On January 31, 2008, Way Fabricators, TEAM and Wells Fargo, a South Dakota National Association with its corporate headquarters at 420 Montgomery Street, San Francisco, California 94163 ("Wells Fargo" or the "escrow agent"), entered into an Escrow Agreement for such escrow agency purposes.  Under the Escrow Agreement, TEAM delivered $500,000.00 (the "escrow property")  to Wells Fargo as the escrow agent.  Among other

24

things, the Escrow Agreement set forth Wells Fargo's responsibilities as the escrow agent, including the following: (1) in the absence of any claims made on the escrow property, Wells Fargo was to disburse the escrow property to FAB on July 31, 2009; (2) if a claim were made against the escrow property pursuant to a claimed breach of the Asset Purchase Agreement, Wells Fargo was to retain and segregate, after the date of the claim, funds in the amount of any such claim made by TEAM; (3) on July 31, 2009, Wells Fargo was to disburse the escrow property to FAB, less any amounts segregated as a result of a claim made; (4) in the event of an unresolved claim against the escrow property, Wells Fargo was to retain the segregated amount of the escrow property until receiving a final, nonappealable ruling from a court of competent jurisdiction as to the unresolved claims; (5) in the event of a ruling entered in favor of TEAM, Wells Fargo would disburse to TEAM from the escrow property the amount necessary to satisfy the adjudicated claim and would disburse any remaining balance to FAB; and (6) in the event of a ruling entered in favor of Way Fabricators, Wells Fargo would disburse to FAB the full amount of the escrow property.

### TEAM's Use and Maintenance of the Facilities

#### Electrical System

Shortly after acquiring the Port Arthur facility and assets, TEAM increased the number of welders from 17 to 24 and the number of employees increased to 70.[12]  TEAM indicated its electrical usage would increase  and informed Entergy of the same.  In a July 25,

---

[12]The number of employees at the Port Arthur facility prior to TEAM's purchase is not disclosed.

2008, email, Peveto noted that Gold Crest Electric Company ("Gold Crest") was "working on getting us a quote to upgrade our electrical/breakers in the east fabrication shop." (Kastens Decl. I ¶ 13, Ex. K (July 25, 2008, email).)[13]  The email further states:

> Jason has brought to our attention that the system is very old and could cause us a problem in the future.  While Randy was here he detected some type of ground issue.  Jason could better describe the issue and the possible problem.  It is not holding us up or causing us any problems at this time.  I talked with Phillip Scott with Entergy (409-960-2247) this morning asking that Entergy replace the power station out side [sic] the east side of our facility because it was a safety issue and was not up to date and we felt it was possibly the cause of some of our electrical problems as well as causing the burning out of panel boards on our equipment.  We have not experienced this since Team purchased us but at times has been a problem in the past.  Mr. Scott said that in the 25 years he has worked for Entergy that they have never covered the cost of any up grades [sic] unless the user needing [sic] more power than what their existing station could supply.  I reminded him of the possible safety possibilities and that we were going to need more power without any possible shutdowns because of our commitments.  Mr. Scott said he would have the manager of this region give me a call next week so I could talk with him.  He also warned me that he get several calls like this a month and anything is possible but very unlikely.  I asked if he could provide us a price so we would have an ideal of the cost.  He said he would need something from Gold Crest describing the changes we were making.  I will contact Gold Crest to see where they stand on putting together a quote.

(*Id.*)  Over the course of the year, TEAM continued its attempts to convince Entergy to replace the transformer serving the old shop, but the efforts continued to meet resistance.

On about July 29, 2008, an Entergy area manager informed Peveto that "Entergy does not upgrade a customers [sic] service at their cost unless they had a [sic] increase in

---

[13]Paragraph 37 of the Plaintiffs' Proposed Additional Facts (ECF No. 36) cites Exhibit  O of the Kastens Declaration I, rather than Exhibit  K of that declaration, and states that the date of the email is "8/1/08."  The Court has corrected the errors.

demand that could not be handled by the existing system in place." (Kastens Decl. I, Ex. N (July 30, 2008, email).) Several days later Peveto met with an Entergy service technician, and informed the technician that TEAM intended to "improve the electrical equipment inside the shop." (*Id.* at ¶ 17, Ex. O (Aug. 1, 2008, email).) Peveto also said that TEAM's electrical "demands would be increasing." (*Id.*) The Entergy technician "agreed that the system should be replaced." (*Id.*) TEAM intended to use this information to "pressure [Entergy] into some assistance." (*Id.*) Despite TEAM's efforts, it was unable to get Entergy to replace or upgrade the transformer.

At TEAM's request, in December of 2008, Gold Crest Electric Company ("Gold Crest") sent TEAM a letter providing an assessment of the electrical system at the Port Arthur facility. Gold Coast stated: "The incoming Entergy power appears to be unreliable due to the age and condition of the power transformers and the fact that Entergy refuses to replace them." (Kastens Decl. I ¶ 12, Ex. J (Dec. 10, 2008, letter ).) Gold Crest noted that the distribution equipment in the old shop was "in need of attention" because "[t]he panels, breakers and transformer are pretty old and considering the dusty environment could fail at any time." (*Id.*) Gold Crest also noted that a number of breakers were underrated for the wire size that was connected to them. (*Id.*) TEAM replaced some breakers at the Port Arthur facility.[14]

---

[14]There is a factual dispute regarding the number of breakers in the old shop that were replaced. (*See* Def.'s Resp. Pls.' PFOF & Statement Add'l Facts ¶ 53.) Theriot estimated that 15 breakers were replaced at costs ranging from ten to 250 dollars. (*Id.*) Sturn indicated that 23 of 132 breakers in the old shop were replaced. (*Id.*)

TEAM did not clean the electric distribution equipment in the old shop after receiving Gold Crest's letter. TEAM's own Port Arthur maintenance manager was expressly instructed by Sturn not to clean the electrical panels, "purportedly to preserve evidence." (Pls.' PFOF ¶ 88.)

*Equipment and Machines*

After the sale of the Port Arthur facility, TEAM began to experience higher weld failure rates than Way had experienced when it had owned the facilities. Way's failure rate on welds was "less than ten, around two to three percent." (Kastens Decl. I ¶ 6, Ex. D (Peveto Dep.) 62.) TEAM has largely attributed the claimed failures on the electrical system as opposed to defects with the machines themselves.

Specifically, TEAM asserts that

> [t]he x-ray reject rate was higher than was expected by Team personnel. Team then decided that they should replace the machines and equipment. The jib hoists failed to work. Even after that replacement, some of the problems continued, and it was then determined that the source of the problem was the electrical system. The replacement costs were detailed in the documents produced by Team on June 30, 2010.

(Kastens Decl. I ¶ 9, Ex. G (Def.'s Ans. Pls.' Interrog. No. 3).)

During Way's ownership of the Port Arthur facility, Way repaired or replaced equipment when it broke or needed repairs. Within seven months of the closing, TEAM had replaced 12 of the 16 welding machines in the old shop. According to TEAM, a number of the welding machines had begun to have problems with inconsistent welding arcs and control

28

panel failures.   With respect to assets, Way propounded and TEAM responded as follows:

> **INTERROGATORY NO. 5:** Identify with specificity all "Assets" that You [sic] assert in the Counterclaim were not in "good operating condition and repair" when they were sold to Team.

> **ANSWER NO. 5:** The electrical system and the machines and equipment in the old shop.   Way did not have a maintenance department.   For an indication of the work to be completed to remedy that problem, please see Exhibit A to the Plaintiff's First Set of Requests for Admission, Interrogatories, and Request for Production to Defendant, Team Industries, Inc., and the April 14, 2009 e-mail from Jason Sturn.   In addition, please see the estimates at pages 69 and 70 of the documents produced by Way.   Welders had complained of surges or fluctuating power and members of Team were getting inconsistent readings on electrical meters.

(*Id.*, Ex. G.)

TEAM did not consult the welding machine manufacturer to determine the cause of the problems.   However, TEAM had a repair company examine the machines and was informed that certain parts would need to be replaced.   Instead of replacing the failed parts, TEAM made a business decision to replace the machines after evaluating the effectiveness and cost efficiencies of replacement and repair alternatives, consideration of the condition of the equipment, and workers' comments on equipment failures.   (*See* Def.'s Response Pls.'  PFOF ¶ 68 (citing Sturn Aff. ¶ 4-11).)   According to Theriot, TEAM never determined the cause of the problems that it had been having with the welding machines it replaced.   TEAM stated that the "jib hoists failed to work." (*Id.*, Ex. G.)   TEAM is demanding that Way pay for the replacement of the jib hoists.

**TEAM's Warranty Claim**

In a letter dated July 24, 2009, TEAM submitted a written warranty claim to Way. TEAM identified the nature of its claim as follows:

> The basis for such claim is that the electrical utility servicing the "old shop" is a safety hazard, fails to meet code and is not adequate suitable [sic] or sufficient to serve the property and provide for normal operation thereof. In particular, the wiring is undersized, the transformer servicing such property is under rated [sic] for what it is servicing and is located outside of the building with exposed wiring and is believed to contain PCB's.[15] This constitutes a safety and fire hazard. Further, the "old shop" electric system has insufficient capacity for current machinery and circuit boards. This, in conjunction with the floating ground, creates operating problems, including power fluctuation, which negatively affects the ability to perform welding.

(*Id.*, Ex. L.) The letter does not mention "sound maintenance practices." *See id.*

TEAM claimed that the cost of repair/replacement was approximately $250,000, and it asserted an additional $70,000 in legal fees. As support for its $250,000 damage claim, TEAM subsequently provided quotations received from suppliers to replace the entire electrical system in the old shop. The TEAM RFQ (request for quotation) contained an extensive list of fixtures and components that it wanted installed, broken into categories: "Panels and Feeders"; "Shop Lighting"; "Shop Receptacles & Power"; and "Break Room & Peripheral Building Lighting, Receptacles & Power."

---

[15]PCB is an abbreviation for polychlorinated biphenyls. (*See* Kastens Decl. I ¶ 22, Ex. T (portions of VERTEX Environmental Site Assessment dated Jan. 15, 2008) 30.)

Shortly after making the warranty claim, TEAM asked Gold Crest to come in and look for possible code violations at the old shop. Gold Crest provided such a report in August of 2009.

TEAM did not begin work on replacing the electrical system until the conclusion of the time period for expert witness reports in this action. TEAM is currently replacing the electrical system in the old shop. According to Peveto, the old shop does not present a safety hazard.

Dennis Rasco ("Rasco"), an expert retained by TEAM, and Peveto agree that it was easy to see on a walk through that it was an old facility with an old electrical system and old lighting. The term "sound maintenance practices" is not defined in the Asset Purchase Agreement or the Real Estate Purchase Agreement. Likewise, "maintained in accordance with sound maintenance practices" is not defined in any of the agreements at issue.

### Testimony from Way's Expert, Donn Rosen

In his written report, Donn Rosen ("Rosen"), Way's retained expert, stated:

Repair maintenance is an acceptable practice for electrical systems. The old adage: if it ain't broke, don't fix it is a completely legitimate philosophy, despite it being contrary to the National Fire Protection Association (NAPA) 70B, which is a recommended practice; not a law. Many companies use the repair maintenance philosophy if they have multiple machines or workstations performing the same task. If one station shuts down, work still continues on the other stations, ensuring continuous performance. On the other hand, if the facility were a process plant, then a preventative maintenance program might be necessary, often causing a complete work shutdown. Way Fabricators was definitely not a process plant. Many other factors

31

> typically determine whether to use a repair maintenance program or a preventative maintenance program. These factors include failure rates of equipment, downtime when a failure occurs, budgets, and loss of business as a result of not meeting scheduled delivery of the product. Based on these factors, repair maintenance for this facility is deemed an acceptable practice.

(Kastens Decl. filed June 22, 2011 (ECF No. 35) ("Kastens Decl. II") ¶ 7, Ex. E (Rosen Report) 5.) Rosen explained: "[I]n an individual facility with multiple work stations, where the loss of any one work station or two work stations would not affect the entire operation of the facility, I would then deem it unnecessary to go to a preventative maintenance program and go to more a repair maintenance program." (*Id.*, Ex. D (Rosen Dep.) 13.)

Rosen indicated that the size of a company and its maintenance budget affect whether repair maintenance is acceptable. He explained: "Budgets also have a very large thing to do with it. . . . Smaller companies, however, don't have the budgets for maintenance. They more work on a repair-as-needed basis." (*Id.*, Ex. D 13.) Rosen also indicated that without an electrical prevention program a company does not necessarily assume a much greater risk of a serious electrical failure and its consequences. (*Id.*, Ex. D 10.)

### TEAM's Expert, Dennis Rasco

Rasco did not perform any testing on the electrical system, except for testing three end-user work stations. (Kastens Decl. I ¶ 8, Ex. F (Rasco Dep.) 34-41).) Rasco did not do any forensic testing to determine whether the electrical supply system caused any weld failures or interrupted TEAM's operations in any manner. In particular, Rasco could not identify any particular piece of equipment that failed because Way had not practiced "sound

32

maintenance practices." (*Id.*, Ex. F 95, 109-10, 162.) Rasco opined that the electrical system should be cleaned "within the next six months or so, the quicker the better." (*Id.*, Ex. F 48.) He did not indicate that safety concerns required that the dirty condition be remedied immediately.

Rasco indicated that people's opinions could differ as to what constituted "sound maintenance practices:"

> Q. Okay. Would you agree with me that the phrase in the document, "sound maintenance practices," is not very precise?
>
> A. To me, it implies – it's not precise, but it implies that some maintenance was done, at least some, which would be at least, to me, cleaning and testing.
>
> Q. All right. But somebody else might have a different opinion when they saw that phrase, might they not?
>
> A. They could, yes.

(*Id.*, Ex. F 68-69.)  Rasco also stated that he had seen small facilities that had employed repair maintenance that were well maintained.

> Q. Okay. Fair enough.
>  Now, you said, to you, sound maintenance practices means doing maintenance, not just repairing it when it breaks.  Did I understand you correctly?
>
> A. That's correct.
>
> Q. That's based on your 36 years of experience dealing with that issue at your Dow facility in Lake Jackson; correct?
>
> A. That's correct.

Q. Where Dow had a multimillion-dollar maintenance budget; correct?

A. That's correct.

Q. Okay. Have you made any effort to determine what I'll call an industry standard for pipe fabricating shops on the scale of the facility that TEAM bought as to what sound maintenance practices would be? Any independent research on that at all?

A. No, I did not.

Q. Okay. It would be fair to say that your opinion is based on your experience at Dow.

A. And other facilities.

Q. Okay. Any other facilities of the size and scale of the TEAM facility in Port Arthur?

A. I would say yes.

(Kastens Decl. II ¶ 3, Ex. A (Rasco Dep.) 64.)

Theriot and Peveto are not electricians and they do not have significant electrical training. According to Rasco, someone without electrical background would not be able to follow the NFPA (National Fire Protection Association) and NEMA (National Electrical Manufacturers Association) documents that set forth what he opined are recommended electrical system maintenance practices. (*See id.* at 67, 88.)

*Edward Peveto*

When Way owned the facility, Peveto was authorized by Way to fix anything that needed to be fixed. They also tried to grease the equipment which is a form of preventive maintenance. (Nash Aff. (ECF No. 44) filed July 8, 2011, Attach. A (Peveto Dep.) 124.) Peveto never submitted requests to replace all welding machines or replace the entire electrical system. Peveto was Way's facilities manager and was responsible for facility maintenance while so employed by Way. At the time of sale: (1) Peveto was unaware of anything needing repair, other than items that may have been "at the repair shop to be repaired"; and (2) the equipment was in good operating condition, except for ordinary wear and tear.

Peveto is not comfortable saying that Way lied about anything. Peveto stated that to his knowledge Way did not misrepresent anything. Peveto has not seen any written agreements between Way Fabricators and TEAM. He has no knowledge of the representations that Way Fabricators made to TEAM as part of the sale of the Port Arthur facility or its electrical system and equipment.

## ANALYSIS

The parties' motions for summary judgment and partial summary judgment focus on the elements of a breach of warranty claim under Wisconsin law.[16] Way's motion

---

[16]Paragraph 12.8 of the Asset Purchase Agreement states that "[t]his Agreement and all questions arising in connection with this Agreement shall be governed by and construed in accordance with the internal laws of the State of Wisconsin." (Compl., Ex. A ¶ 12.8.) In part, TEAM relies upon substantive New York breach of warranty case law. However, since that law is not controlling in this dispute, such case law has not been addressed.

The Asset Purchase Agreement also states that "[t]he parties have jointly participated in the negotiation and drafting of this Agreement, and no rule of strict construction shall be applied to any party to this Agreement." (*Id*., Ex. A,

also presents issues regarding construction of the 2008 agreements. When addressing a question of state law while sitting in diversity, the Court's "task is to ascertain the substantive content of state law as it either has been determined by the highest court of the state or as it would be by that court if the present case were before it now." *Thomas v. H & R Block E. Enters.*, 630 F.3d 659, 663 (7th Cir. 2011).

The burden of proof is on the party relying upon the breach of warranty to show the warranty, the breach thereof, and that its loss resulted from the breach of that warranty. *Dittman v. Nagel*, 43 Wis. 2d 155, 168 N.W.2d 190, 196 (Wis. 1969). A warranty is intended to relieve the promisee of any duty to ascertain the fact for himself, and amounts to a promise to indemnify the promisee for any loss if the fact warranted proves to be untrue. *Id.* at 193.

The interpretation of contracts is a question of law. *Md. Arms Ltd. P'ship v. Connell*, 326 Wis.2d 300, 786 N.W.2d 15, 20 (Wis. 2010). In construing contracts, Wisconsin courts have long recognized the importance of protecting parties' freedom to contract. *Town Bank v. City Real Estate Dev., LLC*, 330 Wis.2d 340, 793 N.W.2d 476, 483 (Wis. 2010). When construing contracts that were freely entered into, the goal of the Wisconsin state courts "is to ascertain the true intentions of the parties as expressed by the contractual language." *Id.* (quoting *State ex rel. Journal/Sentinel, Inc. v. Pleva*, 155 Wis.2d 704, 711, 456 N.W.2d 359 (Wis. 1990)). "Where the terms of a contract are clear and unambiguous, [Wisconsin courts] construe the contract according to its literal terms." *Md. Arms Ltd. P'ship*, 786 N.W.2d at 20.

---

¶ 12.11.)

Wisconsin courts construe the contract language according to its plain or ordinary meaning. *Town Bank*, 793 N.W.2d at 483.

In January 2008, Way expressly warranted that the Assets were: (i) in good operating condition and repair, ordinary wear and tear excepted; (ii) maintained in accordance with sound maintenance practices; (iii) were sufficient for the operation of the Business in the ordinary course of business; and (iv) were suitable for the purpose for which they were presently used. The "Assets" purchased by TEAM were broadly defined as consisting of all tangible assets of every kind and description owned or used in the operation of the Business, including all fixed assets, machinery, equipment, tools, leasehold improvements, tools, accessories, fixtures, furniture, furnishings, vehicles, computers and software, date processing equipment, supplies, and other items of similar character relating to the Business, wherever located. The definition of "Assets" that TEAM purchased also explicitly incorporated the real property at 650 Main Avenue, Port Arthur Texas. The parties agree that the term "maintained in accordance with sound maintenance practices" is not defined in any of the agreements at issue.

### *Team's Partial Summary Judgment Motion*

TEAM maintains that it is entitled to summary judgment finding as a matter of law that Way breached its warranty that the assets were maintained in accordance with sound maintenance practices. However, there is a genuine dispute of material fact as to what "sound maintenance practices" are in the context of the business in which Way engaged. TEAM

largely relies upon Peveto as indicating that Way did not engage in sound maintenance practices. However, Rasco conceded that "sound maintenance practices" can be subject to different interpretations. In addition, Rosen takes the position that repair maintenance is an acceptable practice for electrical systems. Determination of whether Way maintained its assets in accordance with sound maintenance practices is a question of fact. It also will involve a weighing of evidence and credibility determinations that cannot be made on summary judgment. *See Anderson*, 477 U.S. at 255. Construing the evidence and the justifiable inferences from the evidence in the light most favorable to Way, this Court cannot find as a matter of law that TEAM is entitled to partial summary judgment on its counterclaim with respect to Way's liability on the breach of warranty claim. *See id.* Therefore, TEAM's motion for partial summary judgment is denied.

*Way's Summary Judgment Motion*

By its motion for summary judgment, Way maintains that, as a matter of law, TEAM's claim fails because TEAM cannot establish that any insufficiencies of the electrical systems that were within Way's control caused TEAM any damages. Way asserts that TEAM has not presented any evidence as to any possible root cause of the purported electrical problems and also has not presented any evidence that any electrical problems or maintenance practices caused it any damages. Way also contends that it disclaimed all warranties relating to the condition of the electrical system, and that TEAM waived any warranty claim that

relates to equipment and machines because it did not raise those problems in its July 24, 2009, written warranty claim.

In opposition, TEAM maintains that TEAM does have evidence that maintenance practices within Way's control caused TEAM damages. TEAM also asserts that Way's arguments that Way disclaimed or TEAM waived the applicable warranties are belied by the plain language of the contracts and the written demands that TEAM served upon Way within the contractually agreed warranty period.

As with TEAM, the Court first addresses the fact-based component of Way's summary judgment motion which asserts that it is entitled to summary judgment finding that as a matter of law TEAM cannot establish that Way's breach of warranty caused it any damages. Damages for breach of contract compensate the wronged party for damages that arise naturally from the wrong. *Reiman Assocs., Inc. v. R/A Adver., Inc.,* 102 Wis. 2d 305, 306 N.W.2d 292, 300 (Wis. Ct. App. 1981). In order to show liability, the wronged party must show that the breach of contract was a substantial factor in causing the injury. *See id.* at 301.

> *Reiman* further explains:
>
> In all cases involving problems of causation and responsibility for harm, a good many factors may have united in producing the result; the plaintiff's total injury may have been the result of many factors in addition to the defendant's tort or breach of contract. Must the defendant pay damages equivalent to the total harm suffered? Generally the answer is Yes, even though there were contributing factors other than his own conduct. Must the plaintiff show the proportionate part played by the defendant's breach of contract among all the contributing factors causing the injury, and

> must his loss be segregated proportionately?  To these questions
> the answer is generally No.

*Id.* (quoting 5 A. Corbin, *Corbin on Contracts* § 999 (1964) (footnote omitted)).  An award of damages for breach of contract compensates the injured party for losses directly and necessarily flowing from the breach, but not for losses that did not result from the breach. *Repinski v. Clintonville Fed. Sav. & Loan Ass'n,* 49 Wis. 2d 53, 181 N.W.2d 351, 354 (Wis. 1970).  When litigation is a natural and proximate cause of the breach, recovery may be had as damages for attorney's fees necessarily incurred in that litigation. *Id.*  Damages must be proved to a reasonable degree of certainty.  *Pleasure Time, Inc., v. Kuss,* 78 Wis. 2d 373, 254 N.W.2d 463, 470 (Wis. 1977).

In contending that TEAM cannot establish causation, Way maintains that TEAM cannot meet its burden of proof as a matter of law because there is no evidence that the "root cause of any failures" was the Port Arthur facility electrical systems or defects in the equipment, citing *Samson v. Riesing*, 62 Wis. 2d 698, 215 N.W.2d 662 (Wis. 1974).  *Samson*, a action arising from salmonella poisoning at a church luncheon, involved a directed verdict for the eleven defendants, in part, because the plaintiffs could not establish negligence on the part of any one or more defendants and there was no basis for vicarious liability although it was clear that there had been negligence.  Here, the issue is whether Way's breach of its warranty that it had engaged in sound maintenance practices was a substantial factor in the problems that TEAM experienced at the Port Arthur facility.  At this juncture of the proceedings, TEAM has presented sufficient evidence, when construed in the light most

favorable to TEAM, upon which a jury could find reasonably conclude that Way's alleged breach of warranty was a substantial factor in TEAM's claimed damages.

Way also asserts that expert testimony is necessary to establish causation citing *Chapman*, 297 F.3d at 685. *Chapman* was a wrongful death action brought under Indiana law alleging that a Maytag range was defective. The appellate court determined that the district court had not properly applied the analytical principles of *Daubert* in admitting the testimony of the plaintiff's purported electrical expert. *Chapman* does not address the need for expert testimony on causation.

Way also cites *Kreyer v. Farmers Co-op. Lumber Co.*, 18 Wis.2d 67, 117 N.W.2d 646, 651 (Wis. 1962), an action for damages brought by the owner of a farm against a defendant company alleging that a fire was due to faulty electrical work done by the defendant's workman. The Wisconsin Supreme Court held that the trial court erred in sustaining the defendant's objection to the hypothetical question on the ground that 'it invaded the province of the jury,' although the court also held that the trial judge properly sustained the objection on the ground of lack of foundation. With respect to the former ruling, the Wisconsin Supreme Court held that "[t]he subject of the electrical wiring in the barn and its role in connection with the fire is one which was beyond the common knowledge of the jury and concerning which the jury obviously would be enlightened by expert testimony." *Id*. Neither case cited by Way holds that expert testimony is required.

Rather, the Wisconsin Supreme Court has held: "Causation is a fact; the existence of causation frequently is an inference to be drawn from the circumstances by the trier of fact." *Merco Distrib. Corp. v. Commercial Police Alarm Co., Inc*., 84 Wis.2d 455, 267 N.W.2d 652, 655 (Wis. 1978). Whether expert testimony is required to prove a given claim is a question of law. *Racine Cnty v. Oracular Milwaukee, Inc.*, 323 Wis.2d 682, 781 N.W.2d 88, 96 (Wis. 2010). The Wisconsin courts have held that in a breach of contract action, the general rule is that expert testimony is not necessary when the issue is within the realm of the ordinary experience of the average juror. *Id*. at 97 (citing *Netzel v. State Sand & Gravel Co.*, 51 Wis.2d 1, 6, 186 N.W.2d 258 (Wis. 1971)). It is only when the jury will be presented with unusually complex and esoteric issues that expert testimony must be presented. *Id*. at 96. While expert testimony might be helpful, Way has not established that TEAM must present expert testimony on the causation issue with respect to the electrical component of its breach of warranty claim.

The Court also concludes that construing the evidence and the inferences from that evidence in the light most favorable to TEAM, it has presented sufficient evidence from which a reasonable jury could find to a reasonable degree of certainty that Way's breach of its warranties with respect to the electrical systems were a substantial factor in the damages that TEAM sustained. Causation may be proved by circumstantial evidence. Taken together and considered in the light most favorable to TEAM, the factual evidence regarding the electrical problems provided by Sturn, Peveto, and Gold Crest, as well as the expert testimony of Rasco

42

that Way did not maintain the electrical system at the Port Arthur facilities in accordance with sound maintenance practices, that dirt, dust, and debris on wires and electrical components present a serious potential for electrical fault and fires, that the electrical equipment in the old shop should be replaced, and that wires connected to two breakers in distribution panel C do not meet the National Electrical Code standard for overcurrent protection is sufficient evidence upon which a reasonable jury could find for TEAM. Therefore, Way has not established that it is entitled to summary judgment on the causation issue.

Way also contends that TEAM expressly released Way from claims resulting from its failure to conduct its own due diligence, citing the "As is, Where is" clause of the Real Estate Purchase Agreement. TEAM counters that under ¶ 5.4 of the Asset Purchase Agreement, TEAM negotiated a contractual right to rely on Way's warranties.

The "As is, Where is" clause of Real Estate Purchase Agreement, states "AS-IS WHERE IS. EXCEPT FOR REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT OR THE ASSET PURCHASE AGREEMENT." Thus, express warranties in the real estate or asset purchase agreement are specifically exempted from the "as-is where is" provision. The exemption for warranties from the buyer's waiver of claims and liabilities on the part of the seller is further reiterated in the same provision which states as follows: "EXCEPT FOR REMEDIES AFFORDED TO BUYER AS A RESULT OF A BREACH OF A SELLER'S REPRESENTATION OR WARRANTY

CONTAINED HEREIN OR IN THE ASSET PURCHASE AGREEMENT." A similar exemption is repeated within the same portion of the agreement.

In addition, ¶ 5.4 of the Asset Purchase Agreement states that "the representations and warranties of the Seller and Partner are made with the knowledge and expectation that the Buyer is placing complete reliance thereon in entering into and performing each of its obligations under the Agreement." (Compl., Ex. A ¶ 5.4.) The language in ¶ 5.2 explicitly states that *"[n]otwithstanding any investigation by or information supplied to the Buyer*, the warranties and representations of Seller and Partner herein contained shall be true and correct." (*Id*. at Ex. A ¶ 5.2 (emphasis added.).) Way's disclaimer argument is contrary to the plain language of the 2008 agreements.

Way also contends that TEAM waived any warranty claim that relates to equipment and machines, because it was not included in its July 24, 2009, warranty claim. Way notes that TEAM has identified two categories of machines and equipment as a part of its damages claims – welding machines and feeders and, other welding related pieces of equipment receiving electrical repair and replacement of equipment, welding machines and jib hoists. (Kasten Decl. ¶ 11, Ex I (TEAM's Computation of Damages).)

TEAM counters that there can be "no doubt that TEAM did not waive the claim relating to the replacement of *the electrical system*." (TEAM's Mem. Opp'n Way's Mot. Summ. J. 18.) (emphasis added.) TEAM further relies on ¶ 11.3 of the Asset Purchase

Agreement and contends that Way was not actually prejudiced by the claim that TEAM presented to it and therefore TEAM may proceed on its entire warranty claim.

In reply, Way states that the purpose of ¶ 11.3(a) is to require that a party give a prompt and adequate description of a claim to the indemnifying party so that the party is timely apprised of the nature and basis of the claim it is being asked to indemnify against and that ¶ 5.2 is a contractually created limitations period, not a notice provision. (Pls.' Reply Br. Summ. J. 9.) Way also states that the Court must read the two provisions in such a manner so that each provision may be given effect, citing *In re Airadigm Commc'n., Inc.*, 616 F.3d 642, 657 (7th Cir. 2010) (applying Wisconsin law). In addition, Way states that, even assuming, for the sake of argument, that there is a conflict between ¶¶ 11.3(a) and ¶ 5.2, ¶ 5.2 still must govern because it is the more specific provision, applying specifically to one particular type of indemnification claim: an indemnification claim based on breach of warranty. *Goldmann Trust v. Goldmann*, 26 Wis. 2d 141, 148, 131 N.W.2d 902 (Wis. 1965) (internal citation omitted).

Paragraph 11.3(a) provides, in relevant part, as follows:

(a) If party [sic] hereto shall claim that it is entitled to be indemnified pursuant to the terms of this Article XI, it (the "Claiming Party") shall notify the party or parties against which the claim is made (the "Indemnifying Party") in writing of such claim promptly after discovery of the facts supporting such claim or receipt of written notice of any claim of a third party (a "Third Party Claim") that may reasonably be expected to result in a claim by such party against the party to which such notice is given, as the case may be. *The failure to give such notice shall not affect the indemnification provided hereunder except to the extent the*

45

> *Indemnifying Party has been actually prejudiced as a result of such failure. . . .*

(Compl, Ex. A, ¶ 11.3.)

TEAM's reliance upon the "actual prejudice" portion of the indemnification provision as enabling it to proceed on its entire warranty claim, not just the electrical system claim is not a reasonable interpretation of the contract as a whole. Paragraph 5.2 provides that Way's warranties survive the Closing for a period of 18 months. Paragraph 5.2 also exempts representations and warranties for partnership matters, title, intellectual property, taxes, ERISA, and environmental contained in paragraphs 5.1(a), (b), (d), (f), (l) and (n), respectively which "shall survive the Closing for the applicable statute of limitations claim." (*Id*., Ex. A, ¶ 5.2.) Thus, the provisions of ¶ 5.2 are reasonably interpreted as providing an 18-month limitations period for warranty claims against Way. Paragraph 5.2 also contains a notice provision requiring that claims for indemnification be made in writing prior to the expiration of the survival periods, and explicitly states that "[a]ny such indemnification claim not so made in writing prior to the applicable survival period shall be deemed to have been waived." Thus, according to ¶ 5.2, failure to given written notice within 18 months waives any warranty claim.

Article XI of the Asset Purchase Agreement, upon which TEAM relies governs broader categories of claims for indemnification made under the agreement – although it also references claims for breach of warranties under the agreement. And, ¶ 11.3 provides for the procedure with respect to indemnification, including a provision providing for notice. In

particular, ¶ 11.3(a) provides a more general notice requirement than that contained in ¶ 5.2 of the warranties for notice.   Paragraph 11.3(a) requires notice "in *writing of such claim promptly after discovery of the facts* supporting such claim or *receipt of written notice of any claim of a third party that may reasonably be expected to result in a claim* by such party against the party."   As noted by TEAM, the indemnification provision also states that "the failure to give such notice *shall not affect the indemnification provided* hereunder except to the extent the Indemnifying Party has been actually prejudiced as a result of such failure."

Giving effect to both contract provisions, consistent with Wisconsin substantive contract law, ¶ 11.3(a) may be reasonably read as inapplicable to warranty claims not made in writing within 18 months of the Closing because they have been waived (or are barred) under ¶ 5.2.   Alternatively, the Court relies upon the Wisconsin law principle of contract interpretation that in the event of a conflict among contract provisions, the more specific provision controls. Under that scenario, the more specific provision ¶ 5.2 would trump the more general provision, ¶ 11.3(a).   Thus, under either interpretation of the Asset Purchase Agreement, TEAM has waived its breach of warranty claim as to the equipment because it failed to give notice of that specific claim within 18 months of the closing.

Based on the foregoing, Way's motion for summary judgment is granted to the extent that the Court concludes that, it has established as a matter of law that TEAM has waived its breach of contract claim as to the equipment and machinery.  However, in all other respects, Way's summary judgment motion is denied.

Based on the disposition of the pending motions, the Court will conduct a status conference by telephone to schedule the final pretrial conference and jury trial dates for Way's claims with respect to the electrical system, and TEAM's counterclaims with respect to the electrical system. The Court will initiate the call.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

Way's motion to exclude the expert testimony, report, and affidavit of TEAM's expert Sturn (ECF No. 39) is **GRANTED**.

Way's motion for summary judgment (ECF No. 21) is **GRANTED** as to the breach of warranty claim pertaining to the equipment, and denied in all other respects.

TEAM's motion for partial summary judgment (ECF No. 23) is **DENIED**.

The parties **MUST PARTICIPATE** in a telephone status conference **on April 25, 2012, at 9:30 a.m.** to schedule the dates for the final pretrial conference and the jury trial of this matter. The Court will initiate the call.

Dated at Milwaukee, Wisconsin, this 30th day of March, 2012.

**BY THE COURT**:

_____
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**